UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| STEPHANIE A. DALE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:10-CV-632 (CEJ) |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. Procedural History

On March 19, 2007, plaintiff Stephanie A. Dale filed applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of July 2, 2006. (Tr. 77-84, 85-87). After plaintiff's applications were denied on initial consideration (Tr. 43-47), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 50-51).

The hearing was held on September 8, 2008. (Tr. 18-38). Plaintiff was represented by counsel. The ALJ denied plaintiff's claims in a decision issued on October 2, 2008. (Tr. 5-17). The Appeals Council denied plaintiff's request for review on February 20, 2010. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

### II. Evidence Before the ALJ

Plaintiff testified that she had completed twelve years of education and trained as a beautician. She resided in an apartment in the City of St. Louis with her husband and fifteen-year-old son. (Tr. 21).

In 1999, plaintiff was working as a shipping clerk when she suffered a back injury. She had surgery but was unable to return to her job. (Tr. 24-25). She worked briefly in a retail clothing store but could not stand for long periods of time without experiencing pain in her lower back, buttocks and left leg. (Tr. 25-26). She next worked as a receptionist for a liquor company. (Tr. 124). She testified that she worked there for two years before she was terminated for "stress and pain. I went to the doctor and they terminated me." (Tr. 26). From 2005 through 2007 she provided daycare services in her home with help from her mother. (Tr. 27). Plaintiff testified that she terminated the business because she "couldn't keep up with the kids" due to pain in her back and left shoulder and left leg. Id. She collected unemployment insurance on two occasions and received worker's compensation in 1998 or 1999 after injuring her back. (Tr. 22).

Plaintiff testified that she has pain in her lower back, left shoulder, left leg and "three baby toes" throughout the day and night. (Tr. 27-28). She described the pain as shooting or like an electric shock. (Tr. 28). She said the pain is excruciating and rated it at level 8 or 9. She also experiences a constant pulling sensation in the back of her left leg at the level of her knee. (Tr. 30). She has to lie down most of the day because she experiences severe pain radiating down her left leg. (Tr. 28). She can sit for 15 to 30 minutes at a time. Id. She does not have a prescription for pain medication, but takes 800 milligrams of Ibuprofen twice a day. She takes medication

for her blood pressure and for heartburn. She can walk a distance of about a half mile. (Tr. 30).

Plaintiff testified that she stays home most of the time. She is able to drive and will do so to go the store or to pick up her son from school. (Tr. 33). With respect to household chores, plaintiff testified that she does dishes, folds laundry, and makes the bed. She does not vacuum and has difficulty completing chores that require bending. (Tr. 36). She cannot lift more than 2 or 3 pounds. She testified that she did not believe that she could work as a telemarketer because she was unable to sit longer than one or two hours at a time. (Tr. 35).

Plaintiff was examined by A.G. Lipede, M.D., in 2008. (Tr. 32). According to plaintiff, Dr. Lipede checked her back, neck, and lungs, and asked her to do some twisting and bending. He checked her legs for numbness and asked her to lift her leg and her arm as high as she could. (Tr. 36). He did not complete an MRI or x-ray. (Tr. 37).

Plaintiff testified that she sought treatment for her neck, back and shoulder pain in 2005. She did not have any subsequent medical care, because she had no medical insurance and was rejected for Medicaid. (Tr. 33). She reported that in August 2008 she obtained insurance through her husband's employer. (Tr. 35).

The record contains a Disability Report completed by plaintiff on March 19, 2007. (Tr. 108-15). She was still providing daycare services at the time she completed the report but felt unable to continue. She described the conditions that kept her from working as: "Back surgery/back hurts/can't lift, sit . . . [or] stand too long, trying to get out of bed in the morning the pain is terrible." (Tr. 109). Her previous work included jobs as a clerk, a hotel housekeeper, a presser at a cleaners, a receptionist,

a switchboard operator, and a telemarketer. (Tr. 110). Her longest period of employment was from December 1994 to September 1998 when she worked as a shipper for a chemical company between  This job required her to lift drums of chemicals and carry them about one foot. The heaviest weight she lifted was 55 pounds and she frequently lifted 25 pounds. (Tr. 111).

Plaintiff also completed a Function Report. (Tr. 116-23). She stated that she cared for two children, ages 4 and 6, with help from her mother on days when she could not get out of bed. (Tr. 117). Plaintiff wrote that she awoke at 6:30 a.m., and got up about 15 or 20 minutes later to get ready for her daycare charges. She provided them with cereal and drove them to school each day. She then showered, dressed for the day, and prepared a meal for herself and her son. She made her bed and did a load of laundry. Her other daily activities included reading to the children and resting. She was usually in bed by 9 p.m. (Tr. 116).

Plaintiff indicated that pain limits her personal care activities: she must sit down to dress and wears a head wrap at all times. She finds it hard to get in and out of the bathtub and so uses the shower. (Tr. 117). She is able to prepare her own meals and do laundry. She sits down to iron. She cannot dust overhead and needs help with tasks that require bending, such as cleaning the refrigerator, or loading and unloading the dishwasher. (Tr. 118). She uses a motorized grocery cart when shopping. (Tr. 119). Her ability to handle money, pay bills, and make change was unimpaired.

Plaintiff identified her hobbies and activities as reading, walking, and going to the movies; however, her inability to sit for long periods or walk long distances interferes with these activities. (Tr. 120). She likes to talk on the phone and gathers with friends and family about once a month. She attends church when she is able. Id.

She needs to be accompanied when she leaves home. She stated that she feels isolated and frustrated due to the restrictions on her activities. (Tr. 121).

Plaintiff described the following abilities as affected by her condition: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, understanding, following instructions, using hands, getting along with others, and concentrating. Id. She stated that sometimes the pain is so severe she cannot think straight or complete tasks. She can walk a distance of a quarter of a mile before needing to rest. She can follow spoken instructions without difficulty, but pain interferes with her ability to focus on written instructions. Id. She stated that she gets along well with authority figures and has never lost a job due to problems getting along with others. (Tr. 122). She wrote that the pain causes her stress and prevents her from having a daily routine. She can become anxious or depressed in response to the pain. Id. She used assistive devices immediately after her back surgery and continues to use a wheelchair when shopping.

Plaintiff completed an updated Disability Report on July 27, 2007. (Tr. 135-41). She stated that her pain had worsened and become intolerable. She noted that she tires more easily and is distracted. The Ibuprofen she relies on causes acid reflux. (Tr. 136). She can not get in or out of the bathtub without help. She can no longer do household chores or bend to tie her own shoes. (Tr. 139).

### III. Medical Evidence

The record contains progress notes completed by Michael Spezia, D.O.[1] (Tr. 156-63). On June 10, 2005, plaintiff complained of dizziness, headaches, and weakness on her left side. A CT scan of the head completed on June 13, 2005 was

---

[1] Dr. Spezia's records are nearly illegible.

negative. (Tr. 164). Similarly, an ultrasound of plaintiff's cerebral vascular system showed good vertebral artery flow and no evidence of stenosis in the carotid arteries. (Tr. 162).

On June 23, 2005, plaintiff was evaluated by Seth M. Dannis, M.D., of the neurosurgery division at SLU Care. (Tr. 153). Plaintiff presented with left lower extremity paresthesias[2] and low back pain on the left side that radiated to her left foot. Sitting worsened the pain. Plaintiff also complained of intermittent paresthesias on the left arm radiating to her hand. She denied neck pain. Her bowel and bladder functions were intact. She reported that Tylenol did not provide relief. Upon examination, plaintiff had 5/5 strength bilaterally in upper and lower extremities. There was no Hoffmann's sign[3] present and sensation was grossly intact. Deep tendon reflexes were 1+ at knee jerk and ankle jerk and 2+ at biceps and triceps. Toes were downgoing bilaterally. Spurling's test,[4] straight-leg raise,[5] Phalen's test[6] and reverse Phalen's test were all negative. Dr. Dannis ordered an MRI of the lumbar and cervical spine.

---

[2]An abnormal sensation, such as burning, tingling, tickling or pricking. See Stedman's Med. Dict. 1316 (27th ed. 2000).

[3]A neurologic test, Hoffmann's sign is present if tapping the nail on the third or fourth finger elicits involuntary flexion of the distal phalanx of the thumb and index finger. Merck Manual of Diagnosis and Therapy 1753 (18th ed. 2006).

[4]Spurling's sign: Neck extension and lateral rotation that reproduces radicular pain suggest cervical disk disease. The Merck Manual of Diagnosis and Therapy 325 (18th ed. 2006).

[5]When straight-leg raising induces muscle spasms it suggest intervertebral disk disease. The Merck Manual of Diagnosis and Therapy 325 (18th ed. 2006).

[6]A reproduction of tingling with wrist flexion, suggestive of Carpal Tunnel Syndrome. The Merck Manual of Diagnosis and Therapy 334-35 (18th ed. 2006).

Plaintiff returned to Dr. Spezia's office on July 14, 2005, complaining of pain in the left shoulder and leg, with pressure on the right side. She was described as "stressed out." (Tr. 161). An MRI of the cervical spine completed on July 15, 2005, showed possible disc pathology at T2-T3 but was otherwise unremarkable. (Tr. 160). On July 25, 2005, Dr. Spezia noted that plaintiff suffered from anxiety. Plaintiff's medications included Xanax.[7] (Tr. 159). Plaintiff was referred for psychological treatment. The results of that treatment are not reflected in the record. Plaintiff saw Dr. Spezia again on August 1, 2005, to follow up on her complaints of stress. (Tr. 158).

Plaintiff presented to Sandra L. Tate, M.D., for a consultative medical examination on May 7, 2007. (Tr. 166-70). Plaintiff reported to Dr. Tate that she had ongoing difficulties with low back pain and left leg pain, which she rated at level 8 on a 10-point scale. She described constant aching and numbness in the back of her left lower leg. Her symptoms were aggravated by bending, coughing, sitting, standing, kneeling, twisting, walking, and lifting. Medicines provided little relief. She was able to manage most self-care if she was slow and careful. She stated that she could lift weights, sit for an hour, and stand as long as she likes, but she might experience pain. She reported that she could walk a distance of about a mile. Plaintiff's Oswestry

---

[7]Xanax is indicated for the treatment of panic disorder. See Phys. Desk Ref. 2655-56 (60th ed. 2006).

Disability Index[8] was 50%, "which denotes the patient perceives severe disability." (Tr. 168).

Upon physical examination, plaintiff had normal range of motion of the cervical spine, with no tenderness, spasm, tightness or trigger points. There was mild tenderness of her lumbosacral spine, but her range of motion was within normal limits. (Tr. 169). Examination of plaintiff's shoulders revealed no tenderness of the rotator cuffs or acromioclavicular joints; she exhibited no instability at the shoulders, elbows, and wrists and had normal ranges of motion. She had no tenderness to palpation. Impingement sign, drop arm, and apprehension maneuvers were all negative. Plaintiff showed overall generalized muscle weakness in the upper extremities, graded at 4 out of 5. Straight leg raising was negative; pelvic rock and Patrick's maneuver did not increase pain. The sacroiliac joint was nontender. Plaintiff had bilateral tightness in the hamstrings. The only restriction to plaintiff's range of motion was at the knee and that was due to excessive adipose tissue. (Tr. 169). Reflexes, sensation, pulses, gait, and coordination were all normal. Dr. Tate's opinion was that plaintiff should be restricted from lifting more than 30 pounds and from bending at the waist more than

---

[8] The Oswestry Low Back Pain Disability Index utilizes a patient questionnaire which contains six statements (denoted by the letters A through F) in each of ten sections. The questions concern impairments like pain, and the ability to cope with such things as personal care, lifting, reading, driving, and recreation. For each section, the patient chooses the statement that best describes their status. The designers of the test interpret "percentage of disability" scores in this manner: 0% to 20% - minimal disability; 20% to 40% - moderate disability; 40% to 60% - severe disability; 60% to 80% - crippled; and 80% to 100% - bed bound (or exaggerating symptoms).

MacDonald v. Astrue, 2007 WL 1051507, *2 (D. Mass. Apr. 4, 2007)

four times an hour. Otherwise, Dr. Tate found, no restrictions were required. (Tr. 170).

A Physical Residual Functional Capacity Assessment was completed by medical consultant A. Tayob on May 17, 2007. (Tr. 171-76). Based on a review of the records, the consultant established the following exertional limitations for plaintiff: Occasionally lifting 20 pounds, frequently lifting 10 pounds, standing and/or walking for about 6 hours in an 8-hour day, sitting for about 6 hours in an 8-hour day, and unlimited pushing or pulling. (Tr. 173). She was limited to occasional climbing, stooping, crawling, and crouching. As support for these limitations, the consultant cited Dr. Tate's findings. (Tr. 174). There were no limitations suggested for manipulative tasks, visual ability, communication abilities, or exposure to environmental conditions. (Tr. 174-75).

On September 3, 2008, A.G. Lipede, M.D., completed an independent medical examination and rating of plaintiff. (Tr. 178-87). Plaintiff reported that she sustained an injury to her back at work in November 2006. She stated that while pushing a table around a corner she felt a pop or snap in her back. She experienced pain in her lower back, pulling in the calf of her left leg, and numbness in her left toes. She was diagnosed with a possible herniated disk and an L5-S1 radiculopathy.[9] When facetal and epidural blocks failed to provide relief, plaintiff underwent surgery. A left microdiskectomy was performed in 1999.[10] She was given physical therapy and released to work. Plaintiff never successfully returned to work. (Tr. 180).

---

[9]Disorder of the spinal nerve roots; synonymous with radiculitis. See Stedman's Med. Dict. 1503 (27th ed. 2000).

[10]Dr. Lipede apparently was provided with the operative records. See Tr. 187.

Plaintiff told Dr. Lipede that she experienced low back pain that is exacerbated by lifting and sitting or standing too long. Bending down and carrying objects cause the pain to radiate to her left buttock. She experienced relief if she changes from sitting to standing or from walking to sitting within 15 minutes. She was often wakened from sleep by back pain and numbness in her left leg and toes. NSAIDs and muscle relaxants had not helped. Physical therapy and pain management had not provided relief. (Tr. 181). She stated that she was claustrophobic which prevented her from undergoing an MRI. With respect to her medical history, plaintiff reported that she had a hysterectomy and was being treated for hypertension and hiatal hernia. (Tr. 182).

On physical examination, Dr. Lipede noted that the lumbosacral vertebrae reveal marked loss of the lumbar lordosis[11] with a slight scoliosis to the right and dermatomal neurologic deficit of the left lower extremity congruent to L5/S1. He diagnosed plaintiff with L4-5/S1 radiculopathy radiculitis,[12] L-S spondylosis[13] spondylitis,[14] and postoperative left L5 perineural fibrosis.[15] (Tr. 184). He opined that her present symptoms were complications arising from the original injury and subsequent surgery.

---

[11]The normal convex curvature of the lumbar segment. Stedman's Med. Dict. 1032 (27th ed. 2000).

[12]Disorder of the spinal nerve roots; synonymous with radiculitis. See Stedman's Med. Dict. 1503 (27th ed. 2000).

[13]Ankylosis [or stiffening] of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature Stedman's Med. Dict. 1678 (27th ed. 2000).

[14]Inflammation of one or more vertebrae. Stedman's Med. Dict. 1678 (27th ed. 2000).

[15]Formation of fibrous tissue as a reparative or reactive process, as opposed to formation as a normal constituent of an organ or tissue. Stedman's Med. Dict. 671 (27th ed. 2000).

He further opined that during surgery, "a leak occurred, necessitating a repair of the meninges[16] from L5 and S1 roots." This predisposed plaintiff to perineural fibrosis and neurological deficits and will cause ongoing problems for plaintiff. (Tr. 185).

With respect to plaintiff's ability to work, Dr. Lipede advised plaintiff to limit repetitive lifting and avoid twisting and torsion-like activities. He also advised her to lift no more than 10 pounds and to do so only occasionally. He also advised her to alternate sitting and standing every 10 to 15 minutes and avoid remaining in a fixed position. As a result of his diagnosis and the limitations he found, Dr. Lipede opined that plaintiff has been permanently and totally disabled at least since the time of her surgery. (Tr. 186).

### IV. The ALJ's Decision

In the decision issued on October 2, 2008, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through March 31, 2010.

2. Plaintiff had not engaged in substantial gainful activity since July 2, 2006, the alleged onset date.

3. Plaintiff has the following severe impairment: low back pain.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform light work, with only occasional bending at the waist.

6. Plaintiff is unable to perform any past relevant work.

7. Plaintiff was 40 years old, a younger individual, on the alleged date of onset.

---

[16]Plural of "meninx;" any membrane, specifically one of the membranous coverings of the brain and spinal cord. Stedman's Med. Dict. 1091 (27th ed. 2000).

-11-

8.  Plaintiff has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability using the Medical-Vocational Guidelines. See 20 C.F.R. Part 404, Subpart P, App. 2.

10. Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can do.

11. Plaintiff was not under a disability, as defined in the Social Security Act, from July 2, 2006, through the date of the decision.

(Tr. 10-17).

## V.  Discussion

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the

claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

A. **Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. The ALJ's credibility findings;

    2.    the plaintiff's vocational factors;

    3.    the medical evidence;

    4.    the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

    5.    third-party corroboration of the plaintiff's impairments; and

    6.    when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217, citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

### B. Analysis

Plaintiff contends that the ALJ failed to properly consider her Residual Functional Capacity (RFC); failed to fully develop the record; and improperly failed to obtain evidence from a vocational expert .

Although plaintiff does not contest the ALJ's credibility determination, defendant addresses the ALJ's analysis as integral to the overall decision. Briefly, the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. However, the ALJ found that plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms were not credible. (Tr. 14). In reaching this conclusion, the ALJ noted the absence of objective

medical evidence in the record, the lack of prescription pain medications, and the absence of regular medical care at or around plaintiff's alleged onset date.  Id.

The ALJ also discounted Dr. Lipede's assessment of plaintiff's condition and abilities, noting that his opinion was not supported by medical signs or laboratory findings.  The ALJ also noted that Dr. Lipede relied on surgical records that were seven years old and that were not made part of the administrative record.  (Tr. 14-15). Plaintiff does not challenge the ALJ's decision to discount Dr. Lipede's opinion.

### 1.     The ALJ'S Residual Functional Capacity Determination

Plaintiff asserts that the RFC determination is not based on substantial evidence because the ALJ failed to describe how plaintiff's pain would impact her ability to perform the requirements of work.

The RFC is the most that a claimant can do despite physical or mental limitations.  Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations.  Id.  Ultimately, however, the determination of residual functional capacity is a medical issue, Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), which requires the consideration of supporting evidence from a medical professional, Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ determined that plaintiff retained the Residual Functional Capacity to perform light work with some restrictions.[17] Plaintiff contends that the ALJ's determination failed to take into account her pain. As discussed above, however, the ALJ did not find plaintiff's allegations of disabling pain to be credible--- a finding plaintiff does not contest---and thus properly excluded them from the RFC determination. See Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (ALJ's RFC determination was "influenced by his determination that [plaintiff's] allegations were not credible").

Plaintiff has not established that the ALJ's RFC determination was improper.

### 2. The ALJ's Failure to Develop the Record

In completing his evaluation of plaintiff, Dr. Lipede relied on records from St. Louis University Hospital, Concentra, and Dr. Cohen and operative reports from Drs. Rahini, and Carter. (Tr. 186-87). These records were not provided to the ALJ, who noted their absence and "dr[ew] a negative inference regarding the content of the records." (Tr. 15). Plaintiff argued to the Appeals Council that the ALJ erred in failing to obtain these records (Tr. 150), but once again failed to submit them at that stage for consideration by the Appeals Council. Plaintiff reiterates here that the ALJ had a duty to obtain these records before rendering an opinion.

A social security hearing is a nonadversarial proceeding and the ALJ has the duty to fully develop the record. Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006); Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). While the ALJ must neutrally develop the facts, the ALJ need not seek additional clarifying statements from a

---

[17]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b).

treating physician unless a crucial issue is undeveloped. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); see also Smith, 435 F.3d at 930 (ALJ's "duty may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped). The ALJ is permitted to issue a decision without obtaining additional medical evidence so long as the evidence in the record provides a sufficient basis for the ALJ's decision. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). In determining whether to remand a claim for further development of the record, the Court inquires whether the plaintiff "was prejudiced or treated unfairly by how the ALJ did or did not develop the record." Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). The Court will not remand "absent unfairness or prejudice." Id. (citing Phelan v. Bowen, 846 F.2d 478, 481 (8th Cir. 1988)).

The records at issue apparently date from plaintiff's surgery in 1999. Examinations in later years did not indicate the presence of atrophy or loss of muscle tone, both of which would be expected to result if plaintiff had a disabling condition since 1999. In light of plaintiff's continued failure to submit the records and the absence of objective medical findings to support her claim of disabling pain, the Court cannot say that unfairness or prejudice resulted from the ALJ's failure to obtain the records at issue.

### 3. The ALJ's Reliance on the Medical-Vocational Guidelines

Plaintiff contends that the ALJ was required to obtain the testimony of a vocational expert rather than relying on the Medical-Vocational Guidelines to determine that work existed in the national economy that she was capable of performing.

The Medical-Vocational Guidelines (Guidelines) are a matrix of general findings, established by rule, as to whether work exists in the national economy that a claimant

can perform, taking into account age, education, work experience, and RFC.  By comparing individual factors for a particular claimant to the general findings in the Guidelines, the ALJ can determine whether other work exists in the national economy.[18] See Heckler v. Campbell, 461 U.S. 458, 461-62 (1983) (describing history and composition of Guidelines).

When a claimant suffers only from exertional impairments and the ALJ's findings of RFC, age, education, and previous work experience coincide with the Guidelines, the ALJ may rely exclusively on the Guidelines to determine whether other work exists in the national economy.  20 C.F.R. § 404.1569a(b); see also Campbell, 461 U.S. at 468 (concluding that the use of occupational Guidelines does not violate the Social Security Act and stating that "[t]his type of general factual issue may be resolved as fairly through rulemaking as by introducing the testimony of vocational experts at each disability hearing.").

The Guidelines, however, do not purport to establish jobs that exist in the national economy for claimants who also suffer from nonexertional impairments.  See 20 C.F.R. § 404.1569a(c)(2).   When a claimant suffers from exertional and nonexertional impairments and the exertional impairments alone do not warrant a finding of disability, the ALJ must consider the extent to which the nonexertional impairments further diminish the claimant's work capacity.  Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997), (citing Thompson v. Bowen, 850 F.2d 346, 349 (8th Cir. 1988)).   If the nonexertional impairments significantly limit a claimant's ability to

---

[18]The Medical-Vocational Guidelines consist of three tables (for sedentary, light, and medium work) that may be consulted following a determination of RFC.  The tables direct conclusions of disability or nondisability based on a claimant's age, education, and previous work experience.  See 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 201-03 (2000).

perform the full range of work described in one of the specific categories set forth in the guidelines, the ALJ is required to obtain the testimony of a vocational expert. Reed v. Sullivan, 988 F.2d 812, 816 (8th Cir. 1993).

The ALJ restricted plaintiff to performing light work with the additional limitation of only occasional bending at the waist. Plaintiff argues that testimony of VE was required to determine the effect of that limitation on the occupational base. As a matter of policy, the Social Security Administration has determined that a limitation to only occasional bending leaves the sedentary and light occupational bases "virtually intact." Social Security Ruling 85-15, 1985 WL 56857, *7. The ALJ thus was not required to obtain a VE's testimony to determine whether jobs exist in the national economy that plaintiff can perform.

Plaintiff additionally argues that a VE's testimony was required because she alleges the presence of a significant nonexertional impairment; *i.e.*, pain. "When a claimant's subjective complaints of pain are explicitly discredited for legally sufficient reasons articulated by the ALJ, the Secretary's burden [at the fifth step] may be met by use of the [Medical-Vocational Guidelines]." Baker v. Barnhart, 457 F.3d 882, 894 -95 (8th Cir. 2006) (alterations in original; internal quotations and citations omitted). As discussed above, the ALJ expressly discredited plaintiff's subjective complaints of pain for legally sufficient reasons and use of the Guidelines was proper.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [Doc. #11] is **denied**.

A separate Judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 5th day of July, 2011.